MISSOURI, K. & T. RY. CO. OF TEXAS v. CASSADY. (No. 8123.)†

(Court of Civil Appeals of Texas. Ft. Worth. March 6, 1915. On Motion for Rehearing and Additional Findings, April 3, 1915.)

1. MASTER AND SERVANT ⬦═265—RES IPSA LOQUITUR.

The doctrine res ipsa loquitur applies in an action for injuries sustained by a servant through the master's negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908, 955; Dec. Dig. ⬦═265.]

2. MASTER AND SERVANT ⬦═265—DEFECTIVE BRIDGE—DERAILMENT OF TRAIN—RES IPSA LOQUITUR.

In an action for the wrongful death of plaintiff's husband, a brakeman on defendant's train which was derailed and wrecked upon a trestle, evidence examined and held to sustain a verdict for plaintiff on the theory that the derailment itself, with the surrounding circumstances, and the condition of the trestle, showed that the wreck was caused by some unexplained defect raising an inference of negligence on the part of the defendant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908, 955; Dec. Dig. ⬦═265.]

3. MASTER AND SERVANT ⬦═124, 235 — INSPECTION—BRIDGES.

A railroad company owes the duty to its employés to inspect its roadway and bridges so as to make them reasonably safe, and the employés have the right to rely on the proper performance of such duty.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 235–242, 710–722; Dec. Dig. ⬦═124, 235.]

Appeal from District Court, Cooke County; C. W. Spencer, Judge.

Action by Emma Cassady against the Missouri, Kansas & Texas Railway Company of Texas. From a judgment for plaintiff, defendant appeals. Affirmed.

Chas. C. Huff, A. H. McKnight, and J. M. Chambers, all of Dallas, and Garnett & Garnett, of Gainesville, for appellant. Stuart, Bell & Moore, of Gainesville, for appellee.

BUCK, J. This suit was filed in the district court of Cooke county, Tex., by Mrs. Emma Cassady, as administratrix, for the benefit of herself, as the widow, and of the three minor children of herself and deceased, H. S. Cassady. The latter was killed August 8, 1913, in a wreck alleged to have been caused by the negligence of the defendant company. A trial was had before a jury, and from a verdict and judgment for $12,000, apportioned $3,000 to the widow and $3,000 to each of the three children, defendant appeals.

The only question raised by appellant under its three assignments, which we will consider together, goes to the sufficiency of the evidence to establish the negligence of defendant proximately causing the accident which resulted in the death of deceased.

While crossing a bridge or trestle over a creek and slough the tender left the rails and was thrown across the track at an angle of some 45 degrees, the water tank thereon was overturned and cast to the side of the dump, and the head 12 cars fell through the bridge and were demolished. The deceased was the head brakeman, and at the time of the accident was located somewhere near the front of the train; just where he was at the time or in what position he was the evidence does not disclose very clearly, but he was probably up near the tender. He was found at the bottom of the dump in a badly injured condition, and died shortly afterwards, at about 1:40 p. m. on said date. There is no question raised as to whether his death was caused directly from the injuries received in the accident. Deceased was 32 years old at the time of his death.

The bridge was 20 or 21 bents long. The average length of a bent, as testified to by the bridge foreman, M. P. Whitehurst, was 13 feet and 6 inches. The 3 bents on the south end of the bridge were not destroyed. This witness testified that in August, 1912, a year prior to the accident, the bridge was practically renewed; that he drove 5 new bents, the 5 on the south end, and 3 of which were not destroyed in this accident, and "renewed the entire deck; that means from the piles up." The putting in of new piles on these five bents was necessitated by a former wreck, which tore these 5 south bents out.

In plaintiff's petition she alleged:

"That the bridge and the track and the approaches to the bridge for about 10 or 15 feet south of said bridge and the supports of the same and the rails on the same gave way, fell, spread, and turned as the engine, tender, and cars approached, passed onto, and crossed said bridge; and the engine, tender, and cars of said train, upon which said H. S. Cassady was riding in the discharge of his duties as aforesaid, were thereby caused to leave the rails, fall, and turn over, and said Cassady was precipitated and thrown to the ground and fatally injured and killed; and that the said bridge, tracks, approaches, supports, and rails on the same at said place were defective, unstable, and not sufficiently strong to support said engine, tender, and cars, and were not able to support, hold up, and carry the same; and defendant was guilty of negligence in permitting the same to be and remain in said condition; and that said negligence was the proximate cause of said H. S. Cassady's injury and death, as aforesaid, without any negligence on his part contributing thereto."

Defendant denied:

"That said bridge, approaches, supports or the rails on same were defective, and that they were not sufficiently strong to support said en-

---

⬦═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

† Writ of error pending in Supreme Court.

gine, tender and cars; and that it was negligent in permitting the same to be and remain in that condition; and that said alleged negligence was the proximate cause of H. S. Cassady's injuries and death."

It further alleged the exercise by it of ordinary care in the construction and maintenance of said bridge, supports, approaches, etc., and denied that the wreck was caused by any defect in any part of said bridge or track.

[1] While there is some direct proof that the piles under and supporting this bridge were decayed, and had been so decayed for some months, yet plaintiff relies, in part at least, as ground for showing negligence on the part of the defendant, on the principle of res ipsa loquitur. Defendant urges that this principle does not apply in suits involving the relationship of master and servant as it does in suits by a passenger against a common carrier. While appellant cites us in its brief to certain holdings that seem to make a distinction in the application of this rule between causes of action arising between passenger and carrier and those arising between master and servant, yet a careful review by us of the authorities bearing upon this principle leads us to believe that the great weight of authority in this state is against such distinction. The leading case on this point is that of McCray v. G., H. & S. A. Ry. Co., 89 Tex. 168, 34 S. W. 95. This was an action for the death of a brakeman, caused by a steel rail falling from a freight car, the one immediately in front of the car on which deceased was riding, and catching on some cars standing on an adjacent track, being thrown against deceased and causing his death. In an able opinion by Justice Brown, now Chief Justice, the Supreme Court says:

"It is a general rule that, when a servant sues his master or employer for damages arising from injuries caused by the negligence of the latter, the plaintiff must prove the negligence of the defendant, and that proof of the accident and injury alone will not be sufficient to authorize a recovery. However, it is well settled by authority that the circumstances attending the injury may be sufficient to establish the fact of negligence without any direct proof thereof. In the case of Railway Co. v. Crowder, 63 Tex. on page 504, Judge Stayton, after stating the general rule, says: 'There is no doubt that cases occur in which the accident is of such character as of itself, when considered in connection with the facts which necessarily appear in showing the accident; to amount to sufficient proof of the want of due care by the defendant, and of the exercise of due care by the plaintiff, to authorize a jury to find both facts, without any direct proof on either point; but this does not affect the question of burden of proof, but relates rather to the sufficiency of the evidence furnished by the accident itself. The burden of proof resting on the plaintiff upon the issues of negligence of the defendant and his own exercise of due care requires that he should show the facts surrounding and leading to the accident, and if from these, when shown, a jury may reasonably infer negligence in the defendant contributing to the injury, and the exercise of due care by the plaintiff, then he is entitled to a verdict; but, if he does not show how the accident occurred by which he was injured, by showing his own relation to it, and the other surrounding facts, some or all of which may appear from the character of the accident itself, then he has not gone with his evidence as far as the law requires him to go to authorize a recovery.' Mr. Wharton, in his work on Negligence (section 421), having stated the general rule, says: 'But the very nature of the accident may of itself, and through the presumption it carries, supply the requisite proof.' In Shear. & R. Neg. § 59, the author, having likewise stated the general rule upon the subject, continues: 'In many cases the maxim res ipsa loquitur applies. The affair speaks for itself. It is not that in every case negligence can be assumed from the mere fact of the accident and of injury, but in these cases the surrounding circumstances, which are necessarily brought into view by showing how the accident occurred, contain, without further proof, sufficient evidence of the defendant's duty and of his negligence to perform it. The fact of the casualty and the attendant circumstances may themselves furnish all the proof of negligence that the injured person is able to offer. * * *' In Scott v. Docks Co., 3 Hurl. C. 596, the court announced the same rule in the following language: 'There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant, or his servants, and the accident is such as, in the ordinary course of things, does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care.' The doctrine announced in the foregoing quotations is amply sustained by the authorities, both English and American, of the multitude of which we cite the following: Cooley, Torts, p. 697; 2 Thompson on Neg. p. 1227 et seq.; Holbrook v. Railroad Co. [12 N. Y. 236, 64 Am. Dec. 502]; [Brehm v. Railway Co.] 34 Barb. [N. Y.] 256; Barnowsky v. Helson [89 Mich. 523] 50 N. W. 989 [15 L. R. A. 33]; Howser v. Railroad [80 Md. 146] 30 Atl. 906 [27 L. R. A. 154, 45 Am. St. Rep. 332]. * * * In Howser v. Railroad Co., cited above, the plaintiff was walking along a footpath near the track of the railway, when a train of cars loaded with railroad ties passed by him, and one of the ties fell of, striking the plaintiff, causing his injury. There was no other proof of negligence, and the court held that this proof was sufficient to submit the case to the jury. After reviewing many of the cases upon this question, the court says: 'These and many other English and American cases clearly establish the fact that it is not requisite that the plaintiff's proof, on occasions of this kind, should negative all possible circumstances which would excuse the defendant, but it is sufficient if it negative all probable circumstances which would have this effect.' In the case of Rose v. Transportation Co. [C. C.] 20 Blatchf. 411, 11 Fed. 438, the plaintiff was injured by the explosion of a boiler. There was no evidence of negligence, except the facts surrounding the explosion itself. The court, in speaking of the application of the rule hereinbefore stated, said: 'It is contended, however, that it was error to instruct the jury that they might infer such negligence from the fact of the explosion, and it is argued that such a presumption only obtains when the defendant is under a contract obligation to the plaintiff, as in the case of common carrier or bailee. Undoubtedly, the presumption has been more frequently applied in cases against carriers of passengers than any other cases of negligence, but there is no foundation in authority or in reason for any such limitation of the rule of evidence, as the presumption originates from the nature of the act, not from the relations between the parties. It is indulged as a legitimate inference whenever the occurrence is such as, in the ordinary course of things, does not take place when proper care is exercised, and is one for which the defendant

is responsible.' It was the duty of the railroad company to place the cars in the hands of its employés in a condition reasonably safe to be handled by them in the course of transportation. If the car was not in such condition, either from defects in the car itself or on account of improperly loading the rails thereon, and the injury to the deceased resulted from such unsafe condition, the defendant would be liable for damages occasioned by reason of the injury. This car was in the keeping and under the control of the defendant. The loading of the rails was done by it or by its servants; and, if the accident was such that it would not probably have occurred, in the ordinary course of transportation, if the car had been properly loaded, the circumstances attending the accident would furnish sufficient evidence to authorize a verdict for the plaintiffs if no explanations were given by the defendant. If there be an explanation which would excuse the defendant, it has the means of making the proof, and should do so; and the plaintiffs should not be required to negative every circumstance which might possibly arise whereby the accident might have occurred. The district court erred in instructing the jury, under the circumstances of this case, to find a verdict for the defendant."

The holding that the rule of res ipsa loquitur applies as well in cases between employé and employer as between cases of passengers and carriers, as enunciated in McCray v. Railway Co., quoted from above, has been adhered to by the Supreme Court of this state in a long line of unbroken decisions, though there are some decisions by the Courts of Civil Appeals apparently, and in one case, at least, explicitly, opposing such general application of the rule. In the case of Jones v. Shaw, 16 Tex. Civ. App. 290, 41 S. W. 690, in which writ of error was denied, the plaintiff brought suit for injuries alleged to have been sustained by reason of the negligence of the defendant railway company. He alleged that he was seriously injured by reason of the unsound and dangerous condition of the trucks and framework of the trucks and appliances thereon attached to and used by the defendant as receiver of the Ft. Worth & Denver City Railway, in connection with a certain freight car. In one of its assignments the appellant urges:

"(1) There was no proof of any negligence on the part of the defendant; (2) there was no proof that any of the appliances used by defendant were defective; (3) the proof conclusively shows that the accident was unavoidable and beyond the control of defendant."

In discussing this assignment, the court said:

"The servant has a right to rely upon the presumption that the master will use ordinary care in securing competent and diligent inspectors, and require them, at proper and reasonable intervals, carefully to inspect every car in its trains, while on the master's road; and any defect in such cars, or any part of them, which could have been discovered by such skilled and competent inspectors by the use of ordinary care, in the application of their peculiar skill and knowledge in discovering defects, and which is the cause of injury to the servant, will render the master liable. From the evidence of appellant's witnesses it is clear that without some defect in these trucks or their fastenings, or in the wheels, they should have continued in use in good and safe condition for 15 or 20 years, and the wheels should have lasted and been safe for 5. The track was in good condition, straight, and safe. The car was heavy, but empty. The train was running at ordinary speed; yet, without any apparent cause, this car drops at one corner, leaves the rails, and its trucks become detached, and are found broken, and the injury occurs. The jury had a right to infer from these facts that the car or trucks or wheels or bolster, or some other part of the outfit, was defective. McCray v. Railway Co. [89 Tex. 168] 34 S. W. 95. This was the only reasonable conclusion to be drawn from the fact that the wreck occurred under such circumstances, because, under the circumstances as detailed by appellant's own witnesses, there must have been a defect in this car somewhere, else the wreck would not have occurred. The appellant's evidence shows no other cause for it; in fact, affirmatively shows that no other cause existed."

In the case of Washington v. M., K. & T. Ry. Co., 90 Tex. 314, 38 S. W. 764, the court uses the following language:

"Where the particular thing causing the injury has been shown to be under the management of the defendant, or its servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation that the accident arose from want of care."

In Railway Co. v. Thompson, 116 S. W. 106, in which case the facts disclose that the deceased engineer was killed by derailment of a train, the Court of Appeals for the Fourth District says·

"There was evidence tending to show that defendant's track where the derailment occurred was defective and the rails out of alignment; in fact, appellant concedes there was such evidence, when it seeks to avoid the prima facie case of negligence it makes by proving the rails were disjointed and placed out of alignment by trespassers. The track, in which the evidence tends to show such defect existed, was under the peculiar management and control of defendant and its servants, and the derailment was such an accident as, in the ordinary course of things, does not happen, if those having the care, control, and management of the track use ordinary care to keep and maintain it in a reasonably safe condition for operating trains. Therefore the derailment itself affords reasonable evidence, in the absence of explanation, that the accident arose from want of ordinary care. Washington v. M., K. & T. Ry. Co. [90 Tex. 314] 38 S. W. 764; McCray v. Railroad Co. [89 Tex. 168] 34 S. W. 95; Railway Co. v. Wood, 63 S. W. 165; Railway Co. v. Cherry [44 Tex. Civ. App. 344] 98 S. W. 898; Railway Co. v. Harris [48 Tex. Civ. App. 434] 107 S. W. 109. The case belongs to that class where the very nature of the accident, of itself, through the presumption it carries, supplies the requisite proof of negligence; that is, the circumstances in evidence tend to show that the accident would not have happened if due care had been exercised. * * * Therefore, when the plaintiffs introduced evidence sufficient to warrant the jury in finding that the particular thing causing the injury was under the management of defendant, and the accident was such as, in the ordinary course of things, does not happen, if those who have the management use proper care, it devolved upon the defendant to so explain the occurrence of the derailment as to remove the presumption of its negligence which arose from its happening. In other words, when plaintiffs introduced evidence reasonably sufficient to show that the derailment was caused by defendant's track being out of alignment, the burden was upon defendant to show that such defect neither arose nor continued through

its negligence. This it undertook to do by proving that the defect was caused by trespassers, and that after it was produced ordinary inspection on its part would not have detected it in time to have averted the accident. * * * The state of the evidence is not such as would authorize us to hold, as a matter of law, that defendant discharged this burden in either respect; but, in our opinion, it is such as required its submission to the jury, and, the verdict being against the defendant upon such issue, we are not prepared to say that the evidence is insufficient to support it."

In the case of Railway Co. v. Cason, 129 S. W. 394, this court, speaking through Justice Speer, says:

"A question has arisen whether or not the rule is ever applicable to a case involving the relation of master and servant, and some courts have held flatly that it is not. Broadway v. S. A. Gas Co., 24 Tex. Civ. App. 603, 60 S. W. 270. But there is no reason for this holding when the rule is rightly understood, and the false conclusion doubtless has grown out of the fact that for reasons presently to be stated the rule is less frequently applied to that character of actions. The first test to support the rule laid down in the definition above quoted is that the thing is shown to be under the management of the defendant or his servants. This obviously means servants other than the plaintiff; and, since most master and servant cases fail to measure up to this standard, the rule itself perhaps has been thought to have no application."

[2] As before stated in this opinion, the facts show that the tender left the rails and ran along on the ties for some distance. The evidence further shows that the cars in the train next behind the tender followed the tender off the track, and in so doing gathered up the ties before them, and in a measure stripped the bridge of rails and ties, and that, while the tender did not go through the bridge to the bottom of the ravine, but remained attached to the engine, which was left standing on the north side of the bridge, yet the first car behind the tender did go through the bridge and fall to the bottom of the slough, as well as the other 11 or 12 cars behind that car. Are we able to say or conclude from the circumstances surrounding the accident itself, as well as from the testimony of witnesses that the bridge or its supports were in a defective condition, which caused or contributed to cause, the accident in question? Burt Huyett, a witness for plaintiff testified:

"I saw the pilings and bents on that bridge, and saw the bridge that crossed the slough, which is north of Denton about five or six miles. I noticed that some of the pilings were badly decayed up to the top of the ground. There seemed to be quite a good deal of piling there in that bridge that was badly decayed about the top of the ground."

This witness stated the time about which he was testifying was in October, 1912. He further testified that there had been some new work done there, but that such work had been done some time prior to his inspection of the bridge; that the pilings looked to be cypress; that oak pilings were preferable; and that they made a sounder and safer bridge than pine pilings or cypress. He stated there was a good deal of pilings in the bridge that were badly decayed. It is true that appellant has made, both in its brief and in the oral argument, a vigorous attack on this witness, but the trial court and the jury who heard him testify are in a better position to judge of his credibility than this court, and it seems that one walking over a bridge and carefully examining its construction and the condition of the material composing the same would be, other things being equal, in a better condition to testify as to said conditions than one passing along in a motor car running at the rate of 10 or 15 miles an hour, or in a cupola of a caboose of a freight train, or on the rear platform of a fast-running passenger train. It is true that Mr. Geo. B. Johnson, superintendent of the joint tracks, testified that he was on the last train that passed over this track running south from Whitesboro to Ft. Worth at the head of the derailed train, and, in fact, met the derailed train at the first track (switch) south, 1½ miles; that it was his purpose in going over this division to look out for conditions; that he passed along going north on the 8th day of August about 9 o'clock a. m., and returned about 12:45 p. m.; that while going north he was riding at the rear end of a passenger train, and on returning he was riding in the cupola of the caboose of a freight train. He states that he does not remember looking at the bridge in question as he passed over going south; that there might have been something wrong with the bridge when he passed over it, but it was nothing to cause it to tremble.

George Housden, a witness for the defendant, testified that he was working on the section including this bridge; that he was over that part of the section about 8 o'clock the morning of the accident; that he went over the track in a motor car; that he never went down and examined the bridge; that the motor car was running about 10 or 15 miles an hour. He further testified that it looked to him like the trains that ran over this track were running about 60 or 65 miles an hour, and that it took a pretty good bridge to stand the pressure. The evidence further showed that 20 miles an hour was the speed limit on this division. E. O. Johnson, locomotive engineer, witness for defendant, testified:

"My train ran around or passed the train on which Brakeman Cassady was working at Denton, leaving Denton just ahead of that train, and as my train was pulling away from the water tank at Mingo the train which was afterwards derailed was pulling up to the water tank, and we could not have been over ten minutes ahead of them over Elm creek bridge"—Elm creek bridge being just south of the bridge where the wreck occurred.

He further testified:

"My engine, 534, was the largest switch engine that was permitted on the joint track at that time. I think it weighed about 150 tons. On August 7, 1913, going south over this bridge, we made about 20 miles an hour, and when passing over the same north just ahead of the

train that was derailed we made 30 miles an hour, under special permission given by dispatcher."

The evidence further showed that 40 trains had passed over this bridge going north and south during the day of and prior to the accident. Mr. Johnson, the superintendent, testified:

"It is a fact that running heavy trains and a good many trains over tracks is a strain on a bridge, and is more of a strain than if you run a few trains and light ones. It is a fact that an immense train with a heavy tonnage, when it comes plunging on a bridge that way, going north, makes a great pressure on the uprights that are holding that bridge, and has a tendency to press them over to the north."

J. A. Copper, engineer, testified in behalf of the defendant:

"My train was running at a speed from 40 to 50 miles an hour when we passed over that bridge."

C. R. Mock, engineer, witness for the defendant, testified:

"We crossed this bridge at about 25 miles an hour."

C. C. Hotchkiss, another witness for the defendant, and an engineer, testified:

"I suppose I was running about 25 or 30 miles an hour when my train passed over this point."

M. P. Whitehurst, a witness for the defendant, and bridge foreman for this division, testified:

"It had been some time since there had been any work done on that bridge prior to the accident. I believe the last work we did on that bridge—I think I lined it up maybe in the winter, a little, along about January. I lined it up in January prior to the accident in August. The work we done on it, we sort of lined it up. Sometimes they get out of line a little, and we went over that division working, and when we found anything out of line we lined it up. I don't believe we done any work on it prior to January. I don't believe we done any work on that since the summer before. The bridge was practically renewed the summer before. In August, 1912, I drove five new bents in this bridge. * * * The piles that we drove were the first five bents on the south end of this bridge. Those were the five new bents. The reason that we put in new bents there there were five bents torn out; there had been a wreck on the south end of this bridge and it tore down five bents."

He further testified:

"I inspected this bridge in May before this wreck occurred in August. The way I inspected the bridge I went over the road in a little motor car that we have for that purpose, with an inspection bar that we keep for that purpose. In making an inspection of that kind I do not make same from the car; I get off it and go down under the bridge and feel of each piling and each piece of timber in the bridge; that is, I feel of it with this bar."

He denied that there was a rotten piece of timber in the bridge in May when he inspected it last. He further testified:

"It is a fact that the wheels had gone about 40 feet on the ties from the end of the bridge until it started to tear the bents down. * * * I do not know if I have ever renewed any of the bents from the fifth bent north since I have been on the joint track. I do not know of my own knowledge when the north part of that bridge was driven. There was more of the old

part of the bridge went down than of the new. There was only two new bents that went down."

He further testified:

"We had wooden bridges. I do not know whether iron bridges are stronger than wooden bridges, but they can do away with making so many bents. The reason they are substituting iron bridges for wooden bridges the iron bridges last much longer."

Superintendent Johnson further testified:

"When we renew pilings, as a rule, the old bent is renewed. The reason they were renewed about a year before that was probably because the timbers were worn so that it was necessary to renew them to make them absolutely safe. * * * None of the caps or stringers are made of oak. Oak would last better, but it is not necessary to have oak. Yes; it is a fact that oak would last better than pine. Yes; it is true that the reason we had to make the change on these when we did was from the fact that some of them wore out."

Mr. Whitehurst further testified with reference to the work he did in "lining up" the track across this bridge in January before:

"Yes; we had to kind of prize it over a little; just throwed it over. We had bars for that purpose. The cause of its being out of alignment I said might be from the pilings getting lower on one side than on the other."

A. G. Nelson, locomotive engineer, and witness for the defendant, testified, in answer to questions propounded by counsel for the plaintiff:

"Supposing that I were going along Elm bridge on the Katy, and my tender got off the track one time, and supposing I was going along there and my tender got off at the same place again, as to what I would say about that, will say that if it got off at the same place again there would be something wrong with the track."

Enough of the evidence has been given hereinabove to sustain the finding of the jury that the accident was caused by "the defective and unstable" condition of the bridge, track, supports to the bridge, or approaches to the bridge.

[3] The duty of inspecting the bridges and roadbeds so as to make them reasonably safe for use by trainmen in the discharge of their duties, such as deceased, was incumbent upon the defendant, and the deceased had a right to rely upon the assumption that such inspection or repairs had been done as to make them reasonably safe for him in the discharge of his duties. Nor did the fact that the defense introduced witnesses to testify to the effect that due care had been exercised in the inspection of its bridges and track require the jury to accept the testimony of such witnesses as conclusive proof of such inspection, nor preclude the jury from finding, from the circumstances of the accident itself, against such evidence. M., K. & T. Ry. Co. v. Jones, 117 S. W. 1000. Just how the accident occurred, it is true, no witness is able to definitely state, but it is without question that the tender in this train left the track, and it is a reasonable presumption, it seems to us, based upon testimony in the case, and especially that quoted in this opinion, that such derailment was caused by some unexplained defect raising

an inference of negligence as charged. That the appellant company recognized, or its officers in authority recognized, that the tracks and bridges on this division between Whitesboro and Ft. Worth were not in good condition, was evidenced by the order of 20 miles an hour speed limit, but that, in spite of such general orders, the officers permitted, and even specially authorized, trains to run at a speed greatly in excess of such limit. A few minutes before the accident a train, attached to which was an engine of unusual size, passed over this bridge at a speed of 30 miles an hour. It is supported by the evidence and also by common sense that, where bridges are in a weakened condition, heavy trains running over them, and especially at an excessive speed, will cause accidents.

We feel that, under the circumstances, we are unable to say, as a matter of law, that the negligence of defendant proximately causing the accident and injuries complained of has not been established by the evidence. Therefore the judgment of the trial court is affirmed.

## On Motion for Rehearing and Additional Findings.

We are requested by appellant, in the event its motion for rehearing should be overruled, to file additional findings of fact, which motion is hereby granted in so far as the request for findings upon the question of where, with reference to the south end of the bridge, the evidence shows that the tender left the track is concerned; but as to other matters presented the motion is overruled.

P. G. Johnson, rear brakeman on the train at the time of the accident and witness for plaintiff, testified, in part, as follows:

"Immediately after the accident the engine tank was turned over bottom side upwards down the dump, and the first 12 cars back of the engine were piled up in the bottom of the ravine, and the thirteenth car back of the engine was standing upright on the bridge stringers. The cars back of the last-mentioned car were on the track. The north 75 feet of this bridge was completely demolished, rails, ties, stringers, and pilings torn out, and the bridge for 28 or 30 feet south of the destroyed portion of the trestle was stripped of rails and ties."

Jack McKemy, fireman, and witness for plaintiff, testified in part:

"This bridge was totally destroyed, rails, ties, stringers, pilings, and everything, except about two or three bents on the south end of the bridge. The engine tender was off the track north of the bridge, with tank, which had rested on tender frame, lying at the bottom of dump on left-hand side of the track, bottom side upwards. The first 13 cars and train were stacked up and demolished in slough crossed by the bridge where the accident occurred. This stuff was stacked up for 20 feet or more above the bottom of the slough into which they had fallen. * * * When I say demolished, I mean the rails, ties, caps, stringers, and even the pilings under bridge were torn to pieces. The first 13 cars behind the engine dropped into this slough through the bridge, destroying bridge in doing so, and demolishing themselves when they stacked up one on top of the other in the bottom of this slough. * * * The engine of the train in question was on track undamaged. The frame and trucks of tender were off tracks, but still attached to engine. The tank on tender had tumbled off and rolled down left-hand side of track."

W. L. Beamer, conductor in charge of the train, and witness for plaintiff, testified, in part, as follows:

"The first thing I saw of the accident was when the cars at the head end of the train began stacking up, and the rear train stopped suddenly. I was up in the cupola of the caboose looking ahead of the train, and saw the cars when they commenced to stack up. * * * The engine tender was the first to leave the rails, and first left them about 20 feet west of the west end of the bridge and the trucks and wheels under tender marked about six or eight ties, and then began tearing out the rails, ties, and bridge, and completely demolished the bridge, ties, stringers, caps, piling, and everything for a distance of about 10 bents from the west end."

It seems that the tracks and bridge where the accident occurred do not lie exactly north and south, but perhaps northeast and southwest, and the witnesses use the term "south end" and "west end" both in referring to the end of the bridge from which the train approached.

The witness Jack McKemy, on cross-examination, further testified:

"The first thing I knew of this accident was when the tender of the engine jumped the tracks about ten feet south of the south end of the bridge, where the wreck occurred. I first heard something pop behind me like a gunshot, and on looking back along the train I saw the engine tender turned across the tracks. The tender was not turned across the track at right angles, but was angling across the track sort of southeast and northwest. The tender frame never did become disconnected from the engine, but even after the engine stopped on the north side of this bridge was still attached to the engine. After the tender had pulled clear across this trestle the tank on the tender frame fell off the frame on my side of the train and rolled down the dump."

M. P. Whitehurst, bridge foreman, and witness for defendant, testified, in part, as follows:

"I could tell the place where the train left the rails; there was a mark on the rail just about ten feet south of the end of the bridge; it looked like the wheels had got off there and started on the rails, and then hit the ties about the tenth tie from the bridge, where the wheels first struck the ties. There was a mark on the ball of the rail; it looked like the flange of the wheel had stayed right on the ball of the rail, and then ran until it got on the flange of the wheel, and then run off. The place where the wheels showed to have struck the ties was about nine or ten feet south of the south end of the bridge."

There is considerable evidence by various witnesses as to this matter, but we believe the above-quoted testimony presents fairly the condition of the record upon this point, and therefore we find as a fact that the tender of the engine, if it was the first part of the train to leave the rails, and, if not, that part that did first leave the rails, did so just immediately south of the south end of the bridge, probably about ten feet.

175 S.W.—51

It might be well to add that we have not been called on to consider, and therefore do not determine, the question of whether the defects in the bridge, if any, constituted a proximate cause of the accident, inasmuch as appellant presents no assignment raising that question; the only assignments being that there was no evidence to support the verdict and judgment or any of the issues of negligence alleged.

Motion for rehearing is hereby overruled.