## TEXAS & N. O. R. CO. v. SMITH.
### (No. 1394.)

(Court of Civil Appeals of Texas. Beaumont. June 3, 1926. Rehearing Denied June 16, 1926.)

**1. Master and servant 276(2).**

Evidence *held* insufficient to sustain finding that section hand was struck by object protruding from car in passing train.

**2. Master and servant 278(14) — Section hand held not entitled to recover for injuries by object protruding from passing train, in absence of evidence showing when object came into existence.**

Section hand *held* not entitled to recover for injuries allegedly sustained when struck by object protruding from passing train of railroad, where there was no evidence showing when such object first appeared or came into existence or whether servants of railroad had reasonable time after it existed to have discovered and remedied same.

**3. Courts 94(1).**

Court of Civil Appeals must disregard decisions of other Courts of Civil Appeals where they are in conflict with opinion of Supreme Court.

Appeal from District Court, Jefferson County; Geo. C. O'Brien, Judge.

Action by Will Smith against the Texas & New Orleans Railroad Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Baker, Botts, Parker & Garwood, of Houston, and F. J. & C. T. Duff, of Beaumont, for appellant.

O'Fiel, Wiedemann & Reagan, of Beaumont, for appellee.

HIGHTOWER, C. J. We take from appellant's brief the following statement showing the nature and result of this suit, which is conceded by appellee to be correct:

Appellee filed his original petition in one of the district courts of Jefferson county, and after having alleged that he was an employee of the appellant company as a member of the section gang, working at Voth, Tex., in sections 2 and 5, he made the following allegations:

"That on or about the 11th day of October, 1921, while so employed as aforesaid, and while regularly engaged in the duties of his said employment, and while working on the track at and near Voth, Tex., that plaintiff and his colaborers were required by their section foreman and persons in charge of said work to stand back from the track and permit a freight train which was passing along said track to pass by, and that both plaintiff and colaborers stepped back a safe and suitable distance from said track so that under ordinary circumstances they would have been safe from said train, and that after several cars had already passed by the plaintiff, one of said cars in said train, and about midway of said train, began to pass by, and that some protruding iron bar or rod, plank, or some protruding instrument suspended from said car, and about the height of an ordinary man's head, and while said car was passing the plaintiff, struck the plaintiff on the side of his head, greatly wounding and injuring the plaintiff, and inflicting upon him serious scalp wounds, and from which the plaintiff has not recovered, but that the same constitutes and is a permanent injury to the plaintiff herein.

"That the injury to the plaintiff herein occurred by reason of the fact that the trainmen of defendant company had negligently and carelessly permitted and allowed some rod or iron or plank, or some kind of a protruding instrument or freight car door to swing from said freight car in said train while in motion, and that while said car was passing the plaintiff herein that the same struck the plaintiff, who was using due care for his own safety at said time, and which resulted from a failure to properly inspect and look after said train at and before starting same on the journey at the time described herein, and plaintiff presents that by reason of said injury to him, he has been damaged in the full sum of $10,000, for which he prays judgment of the court herein."

Appellant answered by general demurrer and general denial.

The case was tried with a jury, and was submitted upon special issues, as follows:

"Question 1. Was the plaintiff, Will Smith, on or about the 11th day of October, 1921, near Voth, Tex., struck by some protruding iron bar or rod or plank or other instrument, extending out and protruding from a car in a passing train of defendant, as alleged in plaintiff's petition?

"Question 2. Was the defendant company, or its agents and employees, guilty of negligence, as that term has hereinbefore been defined to you, in permitting or causing, if you find they did so permit or cause, the protrusion or extending out of said instrument, if any, from said train?

---

"Question 3. Was the plaintiff injured by the said protruding instrument, if any, extending out from said train, as alleged?"

"Question 5. Was the negligence, if any, of defendant, the proximate cause, as hereinbefore defined to you, of the injuries, if any, of the plaintiff?

"If in answer to question 5 you say, 'Yes,' and only in that event, then answer the following question:

"Question 6. What amount of money, if any, if paid now, would reasonably compensate the plaintiff for his said damages, if any, he so received?"

The jury answered questions 1, 2, 3, and 5 in the affirmative, and further answered that $250 would be a fair and reasonable compensation for the damages suffered by the plaintiff. Upon motion of the plaintiff therefor, the court entered judgment upon the verdict in his favor for $250, and appellant railroad company has prosecuted this appeal.

[1] Appellant's first contention is that the evidence was wholly insufficient to warrant the jury's answer to question 1, which answer was, in substance, that appellee was struck by some protruding iron bar or rod or plank or other instrument extending out and protruding from a car in a passing train of appellant, as alleged in appellee's petition. We have given the contentions of both sides on this point careful consideration, and we have reached the conclusion that the evidence was wholly insufficient to warrant this answer of the jury, and having reached this conclusion, we think we should set out quite fully the testimony bearing upon this point.

The appellee, as a witness on the stand, testified as follows:

"October 11, 1921, I was working for the Texas & New Orleans Railroad Company. I was working on the section, 555 section, near Voth, a mile this side of Voth. October 11th was the first day I worked there. I started to work that morning. I can't think of the gentleman's name who employed me to go to work; he was in here just now; it was the foreman that I was working for, the gentleman that was in here just now and sworn. I went to work the usual hour to go to work with that gang; I believe it was 7 o'clock, on the morning of October 11th. I worked until 12. As near as I can understand it, it was about 1:30 or nearly 2 o'clock when I got the injury. I had gone back to work after noon, and I was unable to do any more that afternoon and several days afterward. * * *

"On the day this accident occurred, I was standing near the track, I judge about six feet away from a passing freight coming out from Voth coming to Beaumont, standing with a tamping bar in my hand at the time. I looked and seen the train. The fellow pulled out and headed out on the main line from the switch, and I looked and seen a car coming along with lumber, and it seemed that I seen a swinging piece. I seen a swinging piece, and me trying to duck this piece that seems where I got my injury, as near as I understood it. As to how far this thing was sticking out, why I was standing five feet from the track, and it must have been long enough to reach me, as near as I understand it. It must have hit me. That is the last I remember, trying to duck it. At the time I saw it, it was right at me, and that's where I got this injury, as near as I know it, this scar in my head, skull pushed up. I was rendered unconscious by the blow. For over two hours, they claim I was out of my head. It was a swinging piece from a lumber car, freight car, that hit me. It was a freight car, loaded with lumber. * * *"

On cross-examination, appellee further testified:

"The signature you show me is mine, and I made that statement to Mr. McNamara that I signed, I remember when I getten too warm at the ship yards. I don't know whether I made a statement of cramp in the hands, but if it is in the statement that my hands were cramping on that morning, and that I thought it was because I had not been used to the work, and that about two years previously I was working for the ship yards and got too warm and my hands then cramped, why I must have said it. I made that statement that morning in a few minutes to the claim agent of the railroad." (The statement that the plaintiff was referring to was a written statement that appellant produced upon the trial purporting to have been made by plaintiff to appellant's claim agent, Mr. McNamara.) "I know a darkey who was working there with me by the name of Kelly. He is here. Kelly continued to work after I was unconscious there, and I didn't have anything to say to him. That afternoon is when I received the injury. The conversation that I had with Kelly was on our way home, because I was unable to have any conversation with anybody up to the time I started home, because they were working and I were there in the shade. When this thing hit me, I was looking at the train coming to me. I was on the left-hand side of the train coming to Beaumont. My left side was towards the train. I did state to Mr. Barker" (Mr. Barker was the section foreman) "and others who were there with me that I did not know what happened nor how it happened. I stated to him I didn't know what happened, only trying to dodge that piece; that's how I got the lick. I must have said something about that piece hanging out before this lawsuit was filed. I told my doctors I received an injury from something swinging from the train. Dr. Goldstein asked me how I received the injury, and that's what I stated to him; as near as I understand it, it must have been this piece swinging from the train that struck me, because at the time this foreman swung off he said he noticed I was in the clear. The foreman was not standing nearer than I was, because he was standing at the switch stand, and the switch stand is six feet from the track. I am satisfied that whatever hit me must have passed him. It is not a fact that the whole train passed him; he rode the train out of the switch. He didn't go through the full length of the train. * * * The part that passed me after he swung off is where I got my injury."

The written statement that was made by appellee to appellant's claim agent several

days after the accident in question, and which was introduced in evidence by appellant, was as follows:

"My name is Will Smith. Residence, Kings addition, Beaumont, Tex. I am a laborer by occupation and work at various places around Beaumont.

"On Oct. 11, 1921, I went to work for the Texas & New Orleans Railroad as Sec. laborer, and at about 2 p. m. same day I was injured. I was tamping ties just east of east switch at Voth. The day was warm and as far as I recall foreman was not rushing us. While tamping ties the east local came along. Foreman rode it down to east switch and got off. I was about 40 yards east of there and I stepped to the fireman's side to allow train to pass. All the other men, with exception of foreman were on engineer's side. Foreman rode near back of train. I do not know how many cars had gotten by me when I looked back and saw foreman get off. This was the last thing I can remember. I was picked up by other men with a large gash over right temple. I do not know what happened me. I thought I was standing in the clear as I was standing back 4 or 5 ft. I never noticed anything sticking out of train and have no idea as to what happened me. The last I remember was when I looked back towards end of train as foreman got off.

"That morning my hands were cramping a little. I thought it was because I had not been used to the work. About 2 years ago while working for Beaumont Ship Works I got too warm and my hands then cramped.

"After I came to myself out at Voth after being injured my stomach was also cramping.

"Dr. Goldstein treated me 4 or 5 times. He first visited me at my home. My head has now healed but it hurts me as if something was wrong with the bone. I started to work last Monday at Daniels Feed Store. This is first work I have done since accident.
          "[Signed]  Will Smith."

On redirect examination, the appellee testified as follows:

"That statement" (meaning the statement to appellant's claim agent just quoted) "is not in my handwriting. Mr. McNamara, the claim agent for the railroad company, wrote that statement out. He was at the Crosby House when he did it; he called me by there one morning at 6 o'clock, and I come up and made that statement. I don't remember the date of it, to be honest; it was quite a while after the accident happened. I don't remember his reading it over to me; if he did I don't remember. I am not positive. I know he taken my statement; he did the writing. That is my signature at the bottom. This claim agent had been out to my home to see me before he wrote the statement, but I can't just give a definite answer as to how long it was after the accident. It was some length of time before he ever showed up. * * * I didn't tell him when I made the statement that I thought I just got overwarm that morning. I didn't tell him anything about cramping. I was feeling all right when the accident occurred, and as near as I knew myself, I was in perfect good health. * * *

"At one time, as I have stated, I got warm over there at the Beaumont Ship Yards and came home, but I didn't get down from it or taken the cramps. I don't remember how long it was before the accident that I had that spell of overheating. * * * I just felt sick from getting warm and vomited from it. * * * I had not fainted any time near the time of this accident on the railroad. I ain't never fainted in my life that I know anything about."

One Jas. Kelly, who was a colaborer in the section gang with appellee at the time he claims to have been injured, was placed upon the stand by appellee, and he testified that he was present at the time the appellee claims to have been injured, and that appellee told him:

"That he thought it was caused by falling on the journal of the train."

"Will Smith did tell me that he didn't have any recollection or idea of how it happened, or what happened to him. * * * It was the next day that I talked to him about how it happened; it was late in the evening, quite late. He was in bed when I talked to him. He said his head was paining him right sharply at that time. He seemed to talk with a very sound mind at that time."

The witness Kelly further testified, in substance, that he did not see what happened to the appellee or what injured him at the time in question, but that he got to the appellee in a few seconds after he was injured, and that he was down on the ground with his head in the direction of the track and about three feet from the ties, and that he saw blood on his head and some blood on the ground. The witness did not see anything protruding from the train that could have struck appellee. He further testified, in substance, that on the day of the claimed injury to appellee, and about 25 or 30 minutes before the freight train came along, appellee had trouble with cramps. This witness further testified positively that appellee told him that he did not have any recollection or idea as to how he was injured or what happened to him.

The section foreman, Barker, was placed upon the stand by appellant, and testified as follows:

"On the 11th day of October, 1921, I was working just east of Voth. I was section foreman then for the T. & N. O. At that time I was acquainted with a negro by the name of Will Smith, the plaintiff in this case, who went to work for me that day. About 2:30 that day he fell and struck his head and was injured. We were working just east of the east switch; I was surfacing the track from the switch east, and the men were anywhere from 50 to 90 feet; this man was about 90 feet east of the switch. The local train had stopped back west of the switch about 75 feet, and I walked back down the train, going west. It started up, and I caught a car and rode it to the switch stand, about 90 feet west of this man Smith, and got off and stood there until the train went by. I was in about 4 feet of the train, up level with the top of the ties, as it

passed by me. I saw this man Smith. I looked down and he was standing in a ditch alongside the track, about 5 or 6 feet away from the track holding a tamping bar in his hand. The track is raised up there about 3 feet and about 18 inches fill of gravel. The train was coming toward Beaumont. Smith was standing on the left side of the train, and so was I. That is commonly known as the fireman's side. I saw the full length of that train all the way along, that left side. There was not anything on any of the cars that I noticed, sticking out or protruding or moving beyond the train in any way. If there had been, I was in such a position and so observing it that I would have seen it, and it would have struck me, because I was closer to the train than this man, and on higher ground. I did observe the cars as they went by me, and I did not see anything sticking out of a door or hanging on the rods or anything else on any of those cars there; I didn't see anything wrong. After the train passed me, I noticed that this man was gone, and I walked on behind the train, and saw the men cross the track, and when I got to him he was laying there with his head on the gravel, just at the edge of the gravel. I looked around there at the time to see what could have injured him, and I found a rock that had a little blood on it, a good sized boulder. This man was unconscious when I first got to him, but remained in that condition not over 10 minutes. When he came to, he asked me what was the matter, and I says, 'You fell and struck your head on something,' and he stated that he had been overheated at one time and had cramping spells, and I sent a man down to Voth to get a bottle of medicine for the cramp right away, and I gave it to him as soon as he got back. He was holding his stomach and groaning and indicated that he was cramping. Besides, the men stated that his hands were cramping that morning. He was in a sitting posture afterwards. He sat around there awhile, and then I think he lay down by a bush that was near the track, for a while until we got ready to come in. He complained of his legs cramping, shortly after he became conscious, and the men rubbed his legs. * * * When I first got to him after the train passed, his head was about 3 feet from the ties. His feet were further away from the track than his head, angling from the track. The last time I saw him, when I stopped there and was looking, he was looking east, towards Beaumont, the same way the train was going. I didn't see him when he fell over, and I didn't know what had become of him; when I looked again and missed him. * * * Smith said he didn't know what caused his fall. During the time I was there with him, he did not say to me or in my hearing to any one else make a claim or statement that something from the train had struck him. I brought him from the place we were working, east switch, to the section house at Rosedale; that would be about five miles. * * * When a train is passing, it is the duty of section foreman to observe all trains passing. Our instructions are to observe passing trains, and place the men some on one side and some on the other, and if there is anything sticking out or anything wrong, we are to notify or flag the train and stop them, if possible. On this occasion I performed that duty and carried out my instructions as to this particular train. All my men but one were on the right-hand side of the train, and I was myself on the left-hand side. I did not dodge or stoop under or do anything to keep anything from hitting me as it passed."

On cross-examination, the witness Barker repeated:

"When he regained consciousness, he talked just as intelligently as he did before he was hit. And he told me at that time that he didn't know what hit him. I observed the condition of the cars in that train before I got on and after I dropped off; that is, those that I passed by going down. I did not see anything swinging or protruding from that train by which this man could have been injured."

Dr. Goldstein of Beaumont, called to the witness stand by appellant, testified, in substance, that a few days after the injury to appellee he was called to treat him, and that appellee told him that he received the injury to his head when he fell down by the railroad track. Dr. Goldstein testified that appellee never at any time during his treatment of him made any statement to him that he was struck by any object swinging or protruding from a passing train. The doctor testified that he asked the appellee what caused the injury to his head, and the reply was that he had fallen down by the railroad track.

The foregoing is a sufficient statement of the material evidence bearing upon the point under consideration, and it seems to us that after giving to appellee's evidence and that of his witness James Kelly the most favorable construction that it will bear for appellee, still there is so much uncertainty, and so much speculation as to what caused appellee's injuries, that the jury was not warranted in finding, as they did, that some iron bar or rod or plank that was protruding from or swinging from appellant's train struck and injured the appellee. No one save appellee himself saw any such bar, rod, or plank or other object protruding or swinging from the passing train, and if the evidence of the foreman and appellee's witness Kelly is entitled to any credence at all, it shows that appellee himself never knew and had no idea what it was that struck him, if anything. His own manner of testifying shows that he was in great doubt, at least, as to what caused his injuries. But if we should ignore entirely the testimony of the section foreman, Barker, and appellee's witness Kelly on this point, still there is the testimony of Dr. Goldstein, who, so far as this record shows, is a credible man and reputable physician, and his testimony is clear and positive to the effect that the appellee told the doctor, while he was treating appellee, that the injury to his head was caused by his falling by the side of the railroad track, and this was in response to a question asked him by the doctor as to what caused his injury. If Dr. Goldstein told the truth in that connection,

the appellee did not know even at that time what had caused the injury to his head, or, at least, he did not know that it was caused by any iron rod or bar or plank or other object protruding or swinging from appellant's passing train. It would have been most natural for him to have told Dr. Goldstein, while treating him, that the injury to his head was caused by his being struck by a bar or rod or plank or other object that was swinging or protruding from the passing train, if such was the fact, and it is most remarkable that instead of making such statement to the doctor, he should tell him that he received the injury by falling by the side of the track.

In reaching our conclusion on this point, we are not unmindful that the record shows that appellee, while a witness on the stand, denied that he had stated to his witness Kelly that he did not know how he came to be injured, and further denied that he had had cramps on that day before the claimed injury. But in view of all the testimony of all the witnesses, and in view of the weakness of the testimony of appellee himself, showing such uncertainty and doubt on his part as to what caused his injuries, we feel that it is our duty to reverse this judgment and remand the cause for a new trial.

[2] There is another contention made by appellant by its second proposition, which is that the jury's answer to question 2, which we have shown, is wholly without any evidence to support it, and in this connection counsel for appellant point out that there was no evidence whatever showing or tending to show when the protruding instrument or object, whatever it was that struck appellee, first appeared or came into existence; that is to say, how long before the accident it existed, and whether or not the agents and servants of appellant had a reasonable time, after it existed, to have discovered and remedied the same, and that therefore actionable negligence on the part of appellant was not shown. We are inclined to think that this proposition has support by the record as it now stands. There is not a thing in the record, positive evidence or circumstances, from which any reasonable inference might be drawn as to how long the object or instrument had been swinging or protruding from appellant's train before it struck the appellee, if, indeed, there was such a protruding or swinging object or instrument. The testimony shows that this freight train had just come back to the main line from a switch at Voth, and there is nothing to indicate where the car came from that had swinging or protruding from it this object or instrument that appellee now claims caused his injury, nor how long that situation had existed. We think that the case is very parallel in principle to that of Railway Co. v. Endsley, 103 Tex. 434, 129 S. W. 342, and that the decision by our Supreme Court in that case ought to be given application here. The decision in that case was in answer to a certified question from a Court of Civil Appeals, and among other things the answer was as follows:

"The fact that the injury occurred and that such injury resulted from a defective condition of the defendant's car is not sufficient to establish the necessary fact that the railroad company was negligent in permitting the door to be in that condition. [Citing authorities.]

"In the Barrager Case, above cited, damages were claimed for an injury received by a brakeman through the pulling out of a drawhead, and this court said: 'To say that the burden is upon the servant to show negligence upon part of the master when he seeks to recover damages for injuries resulting from defective machinery, is but to announce the elementary proposition that the plaintiff must prove his case; and we are of opinion that negligence on part of a railroad company is not to be inferred from the mere fact that a drawhead has become detached in the operation of moving the train. [Citing authorities.] So that it seems to us that upon his main proposition the plaintiff has failed in his case.'

"The evidence does not disclose any fact which would tend to show when or how the defect in the door of the car occurred, nor does there appear to be any evidence as to ownership of the car, how long it had been in the yard, or whether it had been in the possession of the railroad company sufficient time for the defect to be discovered when Endsley was struck, nor any fact from which a jury could determine that in the exercise of ordinary care the railroad company should have discovered the defect before the injury occurred. The fact that cars were being pushed in the yard would indicate that they had just been brought in and may have come from another road, or the break in the door may have occurred while it was out on the road. If the maxim, res ipsa loquitur, be applicable to this character of case, the evidence must suggest the character of the negligent act—it is not sufficient that it may raise a suspicion of negligence of some kind."

[3] Now, learned counsel for appellee insist that the case of A. T. & S. F. Railway Co. v. Shadden (Tex. Civ. App.) 185 S. W. 629, and M. K. & T. Railway Co. v. Scarborough, 29 Tex. Civ. App. 194, 68 S. W. 198, are authorities supporting their contention that the evidence in this case was sufficient to support the jury's finding that appellant was guilty of negligence in allowing the bar rod, plank, or other object, whatever it was, to be swinging and protruding from a car in the passing train, and in consequence of which appellee was injured. We have read all the authorities cited by counsel for appellee, and the two just mentioned especially, both of which were by Courts of Civil Appeals in this state; but they both rest upon the facts of those particular cases, in which the court held that the negligence of the company consisted in the manner in

which its employees had loaded the cars with material which protruded from the cars and caused the injury. The Shadden Case is differentiated by Judge Brown on that point in his decision in the Endsley Case. If, however, the decisions of the Courts of Civil Appeals in the Shadden and Scarborough Cases should be construed as supporting appellee's contention that the mere happening of the injury to the appellee in this case showed negligence, then it would be our duty to disregard them both, for the reason that such a construction of those cases would render them in conflict with the opinion of the Supreme Court in the Endsley Case.

We have reached the conclusion, therefore, that appellant's second proposition must be sustained, and these conclusions compel us to reverse the judgment in this case and remand the cause for a new trial.