## TEXAS & P. RY. CO. v. GREENE.[*]
(No. 11667.)

(Court of Civil Appeals of Texas. Fort Worth. Jan. 15, 1927. Rehearing Denied Feb. 26, 1927.)

**1. Railroads ⬤⇒350(1)—Railroad's negligence in operating freight car in condition permitting door to swing outward and strike pedestrians held for jury.**

In action against railroad for injuries when pedestrian was struck by car door of passing freight train, evidence *held* to take to jury question whether defendant was negligent in operating train with car in such condition, where it showed operation of train across streets of populous city, after more or less casual inspection, in condition so that car doors might swing outward.

**2. Railroads ⬤⇒346(1)—Pedestrian, injured by car door of passing freight train, must show railroad's negligence.**

In action against railroad for injuries when pedestrian was struck by car door of passing freight train, burden of proof was on plaintiff to establish material allegations of his petition, including that of negligence in operating train across city in condition so that car doors might swing outward.

**3. Evidence ⬤⇒48—Court takes judicial notice of weather report for particular day.**

Court will take judicial notice of weather report for particular date, which showed that the sun set at 6:40 p. m., that the evening was cloudy, and that it was dark 30 minutes after sunset.

**4. Railroads ⬤⇒346(3)—Pedestrian's injury by car door of passing freight train raised inference of negligence under rule of res ipsa loquitur.**

Injury to pedestrian, caused by being struck by car door of passing freight train, *held* to raise inference of negligence of railroad under rule of res ipsa loquitur, where inspection of train had been more or less casual and in evening about dark.

**5. Appeal and error ⬤⇒1062(2)—Refusal to submit issue whether injured pedestrian was negligent in being as close to passing train as he was, if error, held harmless, in view of pleading, evidence, and issue submitted.**

In action against railroad for injuries when pedestrian was struck by car door of passing freight train, refusal to submit issue whether plaintiff was negligent in being as close to train as he was, if error, *held* not reversible, in view of pleadings and evidence as to contributory negligence and issue submitted as to whether plaintiff was negligent in placing himself where he was at time of accident.

**6. Negligence ⬤⇒138(3)—Charge should be limited to negligence alleged.**

In personal injury action court's charge should be limited to acts of negligence alleged.

**7. Trial ⬤⇒252(7)—Negligent acts, alleged unsupported by proof, may be disregarded in charge.**

Acts of negligence alleged, in support of which there is no proof whatever, may be disregarded in court's charge in personal injury action.

Appeal from District Court, Tarrant County; H. S. Lattimore, Judge.

Action by A. H. Greene against the Texas & Pacific Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Thompson & Barwise and F. B. Walker, all of Fort Worth, for appellant.

Jones, Buck & Gibson, of Fort Worth, for appellee.

CONNER, C. J. This suit was filed in the Ninety-Sixth district court of Tarrant county, Tex., by A. H. Greene, against the Texas &

Pacific Railway Company, for damages alleged to have been sustained because of personal injury received by the appellee.

The appellee in his first amended original petition, filed on the 12th day of December, 1925, alleged that on the 19th day of March 1925, appellant owned and operated a line of railroad in the city of Fort Worth, Tex., in a westerly direction from its depot to and across Henderson street and Rio Grande avenue; that at or about 8 p. m. on the date mentioned he was required to cross over appellant's tracks which intersect Rio Grande avenue and Henderson street in going from his place of business to his home, and, when he reached said grade crossing, found it blocked and obstructed by one or more of appellant's trains. Appellee further alleged that when he reached a safe and proper distance from the side of the train he stopped for the purpose of allowing and permitting said train to pass over and clear said crossing, and, while standing in said street at a reasonable and proper place, he was struck by a car door or some other object, or that, by reason of such door or object being in a position to strike him, in dodging or attempting to avoid the door or object he was knocked down or caused to fall, and received such injuries as necessitated the amputation of his arm between the elbow and wrist.

Appellee alleged as against appellant specific acts of negligence, in substance, as follows: That appellant negligently allowed and permitted one or more of its said cars and the appurtenances thereto, especially the door on one side thereof, to become broken, worn, and in such state of repair as to allow said door to become loosened from the side of said car and to swing out at an angle; that appellant negligently allowed and permitted said car, which was defective in the manner and way set out above, to be placed in said train and hauled along its route; that appellant negligently failed to inspect said car, its appurtenances affixed thereto, especially the door and its support; that appellant negligently caused and permitted oil, water, and other waste from its engine and cars to escape therefrom and to fall and remain on the street, sidewalk, and that portion of appellant's right of way which crosses the streets and sidewalks where appellee was injured, and negligently permitted said place to become slick and slippery; that appellant negligently caused and permitted some object, a better description of which cannot be given, to project and extend a dangerous distance from the side of its said car and train; that appellant negligently hauled in said train a car, the door of which was negligently left open or insecurely fastened and in a dangerous position.

Appellant, by its answer, after pleading a general demurrer, certain special exceptions, and a general denial, pleaded contributory negligence upon the part of said appellee in general terms.

The court submitted the case to the jury on special issues, submitting:

"(1) Was the plaintiff struck by a door attached to a car of defendant's train? Ans. Yes.

"(2) Did the plaintiff fall under defendant's train in an effort to avoid being struck by a door attached to a car on plaintiff's train? Ans. Yes.

"(3) If you have answered both 1 and 2 'No,' you need not answer 3 and 4, but, if you have answered either of them 'Yes,' then answer the following question regarding the matter to which you have answered 'Yes,' if you have: Was the operation by defendant of a train with a car in the condition which you have found the same was in, answering said question as referred to in the instructions above, negligence, as that term is defined to you? Ans. Yes.

"(4) If you have answered No. 3 'No,' you need not answer No. 4, but, if you have answered it 'Yes,' then answer: Was such negligence, if any you have found, a proximate cause, as that term is defined to you, of any injury to the plaintiff? Ans. Yes."

Under appropriate instructions, the jury assessed the plaintiff's damages in the sum of $7,000, in which amount the court rendered judgment in the plaintiff's favor. From this judgment the defendant has duly appealed to this court.

[1] The question presented in appellant's third and seventh propositions is of controlling effect. In the propositions referred to it is insisted that the court committed error in submitting special issue No. 3, and that the instruction should have been peremptorily in appellant's favor.

In substance, the evidence shows that the appellant company operates a line of railway extending in an easterly and westerly direction through the city of Fort Worth, crossing, among others, Henderson street and Rio Grande avenue at their intersection. Henderson street extends in a northerly and southerly direction, and Rio Grande avenue extends in approximately an easterly and westerly direction. About 7:55 p. m. on the evening of March 19, 1925, appellant started one of its freight trains from Fort Worth west. The train, when formed, originally contained 64 cars, and was of such length as that the rear of said train was some little distance west of South Main street, and the engine of said train, which was headed west, was somewhere near South Adams street, the first street running north and south, east of Henderson street. It became necessary to move this train upon a side or passing track in order than an east-bound freight train might come into Fort Worth, and about 7:30 or 8 o'clock p. m. the west-bound train (being the one involved in this case) moved in a westerly direction that it might be placed upon this lead track in order to allow the east-bound train to come in. In making this movement, the west-bound train crossed Henderson

street and at least momentarily blocked Henderson street. Presumably, while the west-bound train was making this movement, appellee, Greene, came out of his plant, which is situated on Henderson street, possibly 50 feet from the railroad crossing, for the purpose of going to his home, which was located on Henderson street opposite to his plant and north of the railroad tracks.

When appellee, Greene, arrived at the crossing, his testimony is that the crossing was blocked. He further testified, in substance, that he was unable to tell the length of the train, and that he could not see the end of it; that a Ford motorcar had driven up to the crossing about the same time, and that he turned to get out of its way and walked east; that, while walking east, nothing occurred that attracted his attention about the train; that, while doing so, he heard the cars bumping like they were going to stop; that, when sure that he was out of the way of the Ford car, he made a circle to go back the other way, and directed his attention to see if they were going to cut the train in two; that the brakes were applied, and he heard the cars bucking behind him, and about that time—he thought while in the act of turning—a door on the car by his side flew open in his face and caused him to fall, not directly towards the train, but a little diagonally toward the train; that, when he saw he was about to fall under the train, he tried to save himself from going under the train, but missed it; that it was over so quick it blotted everything from his mind except that he was hurt; that, when the door flew in his face, he threw out his hand toward off the blow, missed the car, and lunged forward, with the result that the car wheel caught the wrist of his left hand, which necessitated its amputation. Appellee did not seem very certain—though he throught so—that the car door struck him in the face, but an attendant in the hospital later testified to the effect that on the morning after she observed a bruise on appellee's nose, so that we think the evidence justified the conclusion that appellee was actually struck by the car door, if indeed that is material.

Appellee denied, on cross-examination, conflicting statements made to appellant's claim agent and flagman, in which no mention was made of having been hit or threatened by a car door, and to the effect merely that he slipped and fell with his hand under the train.

At the crossing where the accident occurred, appellant maintained a flagman, who testified, among other things, that he heard nothing unusual in the jerking or jarring of the train at that time, and saw no doors flopping out from the bottom of the train.

Conductor McNeely, who was in charge of the west-bound train, testified that he went on duty at 6:30 of the evening in question, but was delayed by the east-bound train; that his record showed that he had registered out of Fort Worth at 7:50 p. m.; that his run was from Fort Worth, the eastern terminal, to Baird, its western terminal; that he had 11 loads, 53 empties, and the caboose, 64 cars in all. He further testified:

"That night after it (the train) was ready to go, I went over the train, leaving the caboose. I was required to get the numbers and make a switch list out and see that the cars were properly fastened up and the loads sealed, and everything in running condition as the company requires it. I went down to the caboose, and after that I took the numbers of all those 64 cars. While I was taking the numbers, 1 was looking over the train and seeing that the train on the side I went down was in proper running condition and everything. I took those numbers down for the purpose of records; am required to furnish other terminal with switch list, train to be switched by. I checked the south side of the train that night. * * * The engine of course was on the west end of it, and the caboose was on the rear end. Before that train started to leave Forth Worth, the caboose was right close to Main street, down by the roundhouse, and the engine was just standing clear of Adams street, I mean east of Adams street. Adams is east of Henderson. Adams is east of where Henderson actually crosses the Texas Pacific track. * * * I know what movement that train made that night before it got out of town. It pulled up a ways up on the lead and stopped. My train, before it started to move, was on the lead track, or make-up track. That lead track joins on the main line track west of Henderson up there right this side of another street there—I cannot think of the name of it there—right the other side, west of Henderson street. This other train had come down the main line, and I was pulling out this lead track, meeting him there, and I instructed the engineer to pull up over these crossings and be up there ready as soon as that train left, and an engine on the lead ahead of us got out of the way, he could pull on out and leave town, which we did. He pulled up there and made a stop. My train moved down this lead track and came to a stop until the caboose of the east train cleared us. Then we went out on the main line to go west. * * * I was stopped just east of Adams street. Then I pulled on up to where the switch engine was, waiting for the east-bound train to go by. I was moving about 3 or 4 miles an hour, very slow. * * * I started to inspect my train, to get the car numbers, along between 6 and 6:30, something like that. I got the number of every car. I did not take the seal number of those cars that were loaded.

"Q. In addition to taking those car numbers, did you look your train over in any way to see if it was in shape to run, or not? A. Yes, sir.

"Q. Just what did you do in that connection? A. I glanced at the running gears and doors to see that the loads were sealed and the doors properly fastened, as is customary.

"Q. Did you see any loose doors, hanging on that, that you recall? A. No, sir. The first I heard that a man may have been hurt about that train was something like 48 hours afterwards."

On cross-examination, he testified:

"I gave my train the onceover as I went along to see that no brake rigging was dragging or air hose disconnected, and everything appeared to be all right; that was the idea, that if there was anything grossly wrong I would probably catch it as I went along. In going out of a station like Fort Worth, we were going over several public streets, and it was necessary that all of the doors be closed and fastened. In the ordinary movement of the train, an open door would not necessarily flop or swing if it was not closed or fastened, it wouldn't swing at all; that is, not as slow movement as we were making, it wouldn't swing. * * * In fast speed around a curve, it might make a door open like that. Any movement of the train is not likely to make a door flop at that rate of speed. In regard to a low joint making the car lurch, at that speed you could not hardly tell it moved. If you get up to fast speed and the car gets to rocking, it will throw it out a little ways, or if going around a curve it would probably drop out some, but going along at 3 or 4 miles an hour a door, I venture to say, won't move. But they are required to be closed; not to avoid inflicting injury on people crossing, but for the reason that car doors lose off if not properly fastened. * * * The train that I was on was a train leaving the Fort Worth terminal made up here.

"Q. Was there anybody whose duty it was to inspect the train before it was turned over to you? A. The car man goes over the train."

A. J. Bishop was rear brakeman, and he testified, having been introduced by appellant, as was also the conductor, whose testimony has just been given. That he learned of the accident after his return from the west-bound trip, some 48 hours later. That he was called to go on duty about 7 p. m., and went about that time. After the east-bound train came in and went on by and cleared the switch point, then the switch engine threw the switch and went out on the main line and came in behind the east-bound train. Then his train pulled out and left town. That during all that time he was at the switch where they were to head out. That, when his train finally got out on the main line, he closed the switch behind the train and ran and got on the caboose. That the train was going slow enough that he could close the switch and run and catch it. That he judged the train was moving at about seven or eight miles an hour when he caught the caboose. He further testified:

"After I went on duty there that night, I checked over that train. I left the caboose and inspected the north side of the train, from caboose to the engine. The head brakeman inspected the south side. I inspected the south side of the train while we were leaving town, * * * as it pulled by me.

"Q. Did you see any loose doors there flopping? A. No, sir."

Cross-examined, he testified that:

"Ordinarily, the conductor takes the initials and numbers of the cars in this train; supposed to. I was down there at the switch where we go out to the main line before we pulled out. I went down there on the engine, and when the engine stopped I went on down to the switch. * * * There is not anything that fixes in my mind the speed the train was making that night. As far as I know, there was nothing unusual about the trip out of town."

The head brakeman, W. A. Varley, testified that he had worked for the Texas & Pacific Railroad for 19 years, and was working for it at the time in question; that he knew Conductor McNeely and Brakeman Bishop, and recalled the accident on Henderson street and Rio Grande avenue, having heard about it some 48 hours after appellee lost his arm. He further testified:

"That night, when I went down to take charge of that train, my caboose was down close to the roundhouse, South Main. The engine was pretty close to Adams. After we left Adams we pulled down west on what is known as the lead track. * * * When the east-bound train came by, and after the switch engine came by, I opened the switch to let our man out. Then I did not get on the engine; I got on the train about 20 cars probably from the engine. * * * When we started to move down the lead track, going west to meet this other train, I walked down there ahead of my engine; I started down before he started. I was about down Henderson street when he started to pull out, and I walked down to the switch. * * * That night there, before my train started to go west, the first thing I did when I went on duty there, I inspected the train. I inspected the south side. Brakeman Bishop, who just preceded me, inspected the north side. I started inspecting the train at the caboose and I walked toward the engine. After my train started to pull out on the main line and I caught back about 20 cars from the engine, I do that in order to get a signal from the rear end when they close that switch. I did not observe those 20 cars that passed me before I boarded it. When the engine started to go out on the main line, I didn't get on the engine. I waited until about 20 cars had gone on the main line.

"Q. As those 20 cars were coming by you, were you watching those cars to observe them or not? A. Yes, sir.

"Q. Did you see any swinging doors on them? A. No, sir.

"Q. That night down there, when you inspected that train, whatever you did to it before it moved up at all, did you see any loose doors on it? A. There was probably some open. If there was, we closed them. We generally find some on every trip.

"Q. If they are there, you are supposed to close them? A. Yes, sir.

"Q. You don't know whether they were there or not? A. I could not swear whether there were on that particular trip.

"Q. If you did, did you or not close them? A. If I did, I closed them."

On cross-examination by counsel for appellee, he testified, among other things, that so far as he was concerned the trip in question was uneventful, just the usual ordinary getting out of town; that there was nothing that

occurred to fix "anything definitely" in his mind other than the "line of duty"; that his train was made up about the usual place for making up trains. He further testified:

"As to my inspection of the south side of my train, there was nothing to fix that in my mind other than that it was the usual inspection. If I found a door open, it was my duty to close it and latch it. I did not seal it. If it was an empty car, I would close it, and if it was a load, I would call somebody to seal it. That is not my duty to seal it; the yard clerk attends to that. I have no recollection of finding a door open. I say that, if I had found one open I would have closed it and latched it, because it was my duty to do that; I know there was none left open. If there was any open, I would have closed it. All I can say is, if I did find a door open, I closed it and latched it, because that was my duty. It was required that the doors be closed before going out of town. I don't know that I found any open and closed them that night. I don't know that I did not."

On cross-examination, he testified:

"We close the doors because it is the rules of the company to keep them closed. That is all I know about it, rules of the company. Lots of things might happen to the doors if not closed. I might 'get hit by one of them myself if one of them was swinging, or some other member of the crew. Possibly a car door won't swing out going 4 or 5 miles an hour. A refrigerator might. In regard to how I mean I might get hit by a door myself if not fastened, if I left a door swinging open, and I was going along the side of the train with my back toward the door that was open, I could very easily get hit, if it was open. As to whether I walk close enough to get hit, if the door is open, if you were in between some of these side tracks, you could not get away from them. A box car door would not fly out the way it was fastened, on a straight track. Going 3 or 4 or 6 miles an hour, there would be no occasion to make it swing out that way. A few brakes on one end of the train setting and others not setting might cause a train to buck a little. That would not necessarily cause a door to swing; the weight of the door itself ought to hold the door down. If there is any rock in the car, it could do it, or inside of a curve it could hang out. A train running over straight track does not rock much, going 4 or 5 miles an hour. It might rock a fraction. The car door on the ordinary car works on rollers, on box cars. They roll either this way or that way."

Shelton Goode testified that at the time in question he was a yard clerk for the appellant company, and that he checked the trains that run west, and that his record showed that he checked the train in question; that he checked it within the two-hour period before it got out. He further testified:

"My object and purpose in checking that train was in order to secure a seal record of the cars and get the numbers of the cars to give the conductor billing for them. Every loaded car door is supposed to be fastened and sealed. We don't necessarily have seals on the cars that are not loaded. I went out there to check that train and get seal numbers and car numbers. I went out that night to do that.

"Q. Did you go up one side or both? A. I went down one side and back up the other.

"Q. And took the numbers of those cars and seal numbers of those cars that were loaded? A. Yes, sir.

"Q. How close did you have to get to those to get the seal number? A. I had to take hold of them with my hand to see if it was fastened.

"Q. Did you or not that night find any open doors? A. I found no open doors."

Cross-examined, he testified:

"I checked the train over and made a record of the loads and the seal numbers, and a record of the initials and numbers of the empty cars. It was my duty to see that all the loaded cars were closed and sealed, on each side. * * * As far as the empty cars were concerned, the only record I made was the number and initial of them."

In behalf of appellant, it is contended with much force that appellee wholly failed to make out a supportable case, inasmuch as he did not attempt to testify to any defect in the door, did not attempt to testify as to why the door flew open, but rests his whole case upon a showing that he received an injury, and that the injury was received by reason of a door flying open; that the record does not contain a single statement showing any defect in the door, and necessarily does not contain a statement as to what such defect, if any there was, consisted of, how long it had been defective, whether a reasonable inspection would detect such defect, if any there was, or any other fact that will shed any light whatsoever as to why the door flew open. And, in support of this contention, particularly urges the case of T. & P. Ry. Co. v. Endsley, reported in 103 Tex. 434, 129 S. W. 342, and T. & N. O. Ry. Co. v. Smith (Tex. Civ. App.) 285 S. W. 913. The Endsley Case was decided by our Supreme Court. In that case it appears that Endsley was a licensee, walking along the side of or near the railway track on a beaten path made by pedestrians; that he saw a train approaching and stopped and "was looking at the car wheels as they run over the frog on the track when something struck him on the back part of his head and knocked him down, inflicting a wound of some length on his head"; that when he got up he saw a car, which had passed him, and was some four or five car lengths away, something swinging out from the car; he did not know what it was, but it looked like the door of the car. The train was moving about 6 or 8 miles per hour. Another witness testified that he saw Endsley when he was knocked down, and that the car passed near to him, but he did not see anything swinging out from the cars; that, if the door of the box car was loose at the bottom and fastened at the top, it would project at the bottom seven or eight inches, and on a curve would be inclined to project further than that. There was no oth-

er evidence tending to prove that there was a loose door upon any car in that train, nor was there any other proof which tended to show that the injury to Endsley was produced by the negligence of the railway company or of any of its servants operating the train. The court held that the judgment in favor of Endsley was not supported by the evidence. In the opinion written by Mr. Justice Brown, later Chief Justice, the court said:

"The fact that the injury occurred and that such injury resulted from a defective condition of the defendant's car is not sufficient to establish the necessary fact that the railroad company was negligent in permitting the door to be in that condition"—citing the cases of G., C. & S. F. Ry. Co. v. Kizziah, 86 Tex. 81, 23 S. W. 578; H. & T. C. Ry. Co. v. Barrager (Tex. Sup.) 14 S. W. 242; M., K. & T. Ry. Co. v. Thompson, 11 Tex. Civ. App. 658, 33 S. W. 718.

The court further said:

"The evidence does not disclose any fact which would tend to show when or how the defect in the door of the car occurred, nor does there appear to be any evidence as to ownership of the car, how long it had been in the yard, or whether it had been in the possession of the railroad company sufficient time for the defect to be discovered when Endsley was struck, nor any fact from which a jury could determine that in the exercise of ordinary care the railroad company should have discovered the defect before the injury occurred. The fact that cars were being pushed in the yard would indicate that they had just been brought in and may have come from another road, or the break in the door may have occurred while it was out on the road. If the maxim, res ipsa loquitur, be applicable to this character of case, the evidence must suggest the character of the negligent act —it is not sufficient that it may raise a suspicion of negligence of some kind."

The judgment in favor of Endsley was accordingly reversed and rendered in behalf of appellant railway company in that case.

Upon the point in question, we think it sufficient to say that the opinion in the case of T. & N. O. Ry. Co. v. Smith (Tex. Civ. App.) 285 S. W. 913, is of like effect.

[2] We quite agree with appellant's counsel that the burden of proof is upon the plaintiff to establish the material allegations of his petition, including that of negligence alleged, but we have concluded, after as careful a consideration of the evidence as we have been able to give, that the case now before us is distinguishable from the cases above cited, so largely relied upon by appellant's able counsel. These cases cited undoubtedly would have supported the contention in behalf of appellant, had the evidence stopped with that offered in behalf of appellee, but it did not stop at this point. On the contrary, thereafter appellant introduced, among others, the four witnesses from whose testimony we have so largely quoted, in the effort, apparently, to prove that in fact there was no car

door swinging open, and that appellee's injury occurred, as there was probably some evidence indicating, by reason of his having slipped along the side of the train and in his effort to regain his position threw out his hand, and it accidentally or inadvertently fell on the rail of the track, where it was mangled. We think that the evidence, critically examined and giving it full force and effect, and allowing all of its reasonable intendments, is sufficient to support the conclusion that to operate a moving train across the streets of a populous city, such as Fort Worth, with doors on its cars left unfastened or in such defective condition as that they may swing outward and injure persons not guilty of a lack of due care for their own safety, constitutes negligence. And, further, that the inspection of the train, as developed by the witnesses offered, was more or less casual and not of the character sufficient under the circumstances to entirely free the appellant company from the imputation of negligence. If so, the court properly refused to peremptorily instruct the jury, and, if so, the finding of the jury in answer to the third special issue submitted is supported.

[3] It is to be remembered that, unlike the facts in the Endsley Case, the train in question was made up at Fort Worth terminal. The car in question, therefore, must have been taken from appellant's yards, and appellant alone knew the length of time such car had been in the yards and subject to observation. Appellant alone had possession of the evidence to show the length of time the car had been in the yards, or whether, if at all, it had just come in, or its condition at that time. No effort was made to enlighten the court or jury on these points. Presumably the car with the loose door, if any there was, was an empty one, and presumably had been unloaded after it came into the yards. It is to be further observed that, in the inspection, the conductor's attention seemed directed more particularly to his duty to see that the loaded cars were sealed and closed, and that the brakes and wheels were in good condition. He nowhere states that he particularly examined the doors of the unloaded cars to see whether they were fastened or not. So, too, the brakemen in their inspection apparently merely walked along the side of the train and not having discovered any open or defective fastened car, passed on. In this connection, we call attention to the fact that, from the weather report, of which we think we may take judicial notice, on the date of the accident the sun set at 6:40 p. m., and the evening was cloudy, and that it was dark some 30 minutes after sunset. The exact time of the several inspections detailed is not shown, but the rear brakeman testified that he was called on duty about 7 o'clock, and it was evidently after this that he made his inspection. The head brakeman refers to

(291 S.W.)

the time that he went to the train as "that night," and Sheldon Goode, the yard clerk, testified that his object in checking the train was "to secure seal records of cars and get numbers of the cars to give to the conductor billing for them"; that he took "the numbers of those cars and seal numbers of those cars that were loaded"; that he "had to take hold of them (the cars) with his hands to see if they were fastened; that the only record he made was the number and initial of the cars. It may thus be inferred that the conductor and yard clerk did not direct their attention to the condition of the doors and fastenings of the unloaded cars, and that the inspection of the brakeman, such as it was, was about dark. In this connection it may not be improper to observe that, while the appellant undertook to show an inspection, yet no evidence was offered in its behalf, nor does it otherwise appear that the switchmen or appellant's employés, who made up the train in the yards before it was delivered to the conductor, and brakeman, who operated it, testified that no open doors, no unfastened doors, or no doors with defective fastenings were observed or reported.

[4] The car in question was continued in the train and presumably delivered at its western terminus, and no evidence was offered to show that no swinging or defectively fastened door was found during the transit or at the western terminus. If in fact appellee was struck by a swinging door, as we must assume from the evidence and verdict, it is undeniable that the car door was unfastened or defectively fastened. It is fairly inferable from the testimony of the witnesses relating to the inspection of the train that no one of them specially examined the car doors of the unloaded cars in order to determine whether or not each door was fastened, or, if fastened, whether or not the fastening was reasonably secure. Apparently the only examination relating to these questions was the mere walking along the side of the train in the darkened hour, during which they failed to observe any open door or any defectively fastened door. We accordingly feel unable to say that the circumstances as a whole do not raise an inference of negligence, under the rule of res ipsa loquitur. Under this rule the circumstances of an accident may themselves furnish proof of and authorize a conclusion of negligence. M., K. & T. Ry. Co. v. Cassady, 175 S. W. 796, by this court, affirmed by the Supreme Court (108 Tex. 61, 184 S. W. 180) in October, 1916; McCray v. G. H. & S. A. Ry. Co., 89 Tex. 168, 34 S. W. 95; Sherman & Redfield on Negligence, § 59; Wharton on Negligence, § 429; Byrne v. Boadle, 2 Hurl. C. 726; C. & O. Ry. Co. v. Davis (Ky.) 58 S. W. 698; and many other cases that might be cited.

The case last above cited was one in which a boy, while waiting at a crossing for a train to pass, and while he was standing 2½ or 3 feet from the train looking in the direction it was going, was caught by a piece of iron projecting from one of the cars by reason of the door being improperly secured, and was thrown under the wheels and injured. The court said:

"To run a train through a populous city, with an iron swinging in and out, as this was shown to be, was necessarily to endanger those on the highway along which it passed, and was evidence from which the jury might properly infer negligence"—citing cases.

[5] If correct in what we have said, it follows that we should overrule appellant's propositions 3 and 7, and the contentions in behalf of appellant thereunder made. The remaining contentions of appellant have not occasioned us so much trouble. Under appellant's fourth proposition it is insisted that the court erred in refusing the following special charge:

"Was the plaintiff guilty of negligence, if any, as that term is defined in the court's main charge, in being as close to the train in question as he was, at the time and place in question?"

Appellee testified with reference to his proximity to the train in the following language:

"During all that time I wasn't still standing. At the time I stopped, the automobile started its motor up and I started. I didn't stand there three seconds. When I was standing, I was about 4 feet from the train. When I turned, I got naturally a little closer to the train. I have no way to measure how much closer I got when I turned, only the distance I was walking along by the train, probably 2 or 3 feet. The train was still moving west about 8 miles an hour."

There was also evidence perhaps tending to show that in walking to get out of the way of the automobile appellee walked off of the paved street and slipped and fell and thus accidentally received his injury. The court submitted the issue of accidental injury requested by appellant, which was answered in the negative, and submitted the issue of contributory negligence in the form set forth above, and which, for the sake of clearness, we here repeat:

"Was the plaintiff negligent, as that term is defined to you, in placing himself where he was at the time of this accident, and just immediately prior thereto, under the facts and circumstances of this case?"

Appellant's plea of contributory negligence was general in its form; no specific act being alleged. And we are of the opinion that the issue submitted by the court was sufficiently specific to call the jury's attention to the evidence relied upon, showing that appellee walked too close to the train, as well as that tending to show that he perhaps walked off of the paved street. Under the circumstances, we do not think we would be justi-

fied in reversing this case, because of the refusal of the court to submit the issue in the form requested. This is particularly true, in view of the fact otherwise appearing, that plaintiff was a sufficient distance from the car track to enable cars in advance of the one which had the swinging door to pass without injury to, or disturbance of, him.

[6, 7] The conclusion announced, we think, sufficiently disposes of appellant's further objection to the issue as submitted by the court on the ground that it permitted the jury to consider special acts alleged, in support of which no evidence had been adduced. It is true that the court's charge should be limited to acts of negligence alleged, and it is also true that acts of negligence alleged in support of which there is no proof whatever may be disregarded. In this case, other than as indicated, there was no proof whatever of any negligence other than is covered by the charge, and appellant requested no special issue seeking a determination of any other specially alleged act of negligence. Under such circumstances, it is highly improbable that a jury took into consideration and were influenced to return a verdict as they did upon issues not submitted, and of which there was an utter lack of evidence. Appellant's fifth and sixth propositions are accordingly overruled.

We finally conclude that what we have said sufficiently disposes of all other propositions upon which appellant relies for a reversal of the judgment in this case, and they are therefore accordingly all overruled, and the judgment is affirmed.